**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>v.<br><br>Joseph Maria Palomino,<br><br>            Defendant. | No. CR-24-01334-001-PHX-DGC<br><br>**ORDER** |

Defendant Joseph Palomino is charged with two counts of making false statements during the purchase of a firearm in violation of 18 U.S.C. § 924(a)(1)(A). He moves to suppress the use of evidence at trial. Doc. 32. The government has responded to the motion (Doc. 38) and the Court heard oral argument and evidence on April 25, 2025. For the reasons stated below, the Court will deny Defendant's motion.

**I.     Background.**

The facts set forth in this order are based on the parties' submissions and testimony from ATF Special Agent James Cauble, Jr., given at the hearing on the motion.

On February 19, 2024, Defendant purchased a Pioneer Arms rifle from Tactical Studio LLC, a Phoenix, Arizona federal firearms licensee, and completed ATF Form 4473. Doc. 38 at 2. On February 24, 2024, he purchased a KMP Classic Arms, Browning 1919 A4 rifle from Tactical and completed another Form 4473, but Tactical did not transfer the firearm to him at that time. Doc. 38 at 2. Instead, a manager at Tactical contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and reported that

Defendant made suspicious statements when purchasing a large, belt-fed, Browning rifle. Docs. 32 at 2; 38 at 2. ATF took possession of the Browning firearm from Tactical on February 26, 2024.

Special Agent Cauble called Defendant on February 29, 2024, told him that ATF had taken possession of the firearm, and asked if Defendant would be willing to talk with him. Agent Cauble testified that Defendant did not seem upset during the conversation and agreed to meet Agent Cauble on March 1, 2024 at a Chevron gas station near his work, during his lunch break. Defendant chose the time and place of the meeting.

On the scheduled day, Agent Cauble and two other ATF agents met Defendant at the gas station. Their discussion occurred outside, was recorded by the agents, lasted about 22 minutes, and ended with the agents issuing Defendant a warning about straw purchases of firearms. Docs. 32-2 at 33, 38 at 4.[1]

Defendant moves to suppress statements made during the gas station encounter, arguing that it violated his Fourth Amendment right against unlawful seizure and his Fifth Amendment right against self-incrimination, and that statements he made during the interview were not voluntarily. Doc. 32.

**II.  Alleged Unlawful Seizure.**

Law enforcement officers may engage citizens in consensual conversations without violating the Constitution. Officers "do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "When an encounter is voluntary, no constitutionally protected right is implicated." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001) (citations omitted).

"For purposes of the Fourth Amendment, a seizure occurs when an officer, through some form of physical force or show of authority, restrains the liberty of a citizen." *Id.*

---

[1] Defendant suggests in his motion that the conversation continued after the recording ended. Doc. 32 at 4 n.4. Defendant cites to a document that has not been provided to the Court and makes no assertion about what was said or done during this additional alleged discussion.

2

Such restraint occurs if, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (citations omitted). Officers must have reasonable suspicion of criminal activity to engage in such a Fourth Amendment seizure. *Summers*, 268 F.3d at 686.

Defendant asserts that the ATF agents seized him without reasonable suspicion, requiring suppression of his statements. Doc. 32 at 4. The government argues that the encounter was consensual and, even if it rose to the level of an investigatory seizure, the agents had reasonable suspicion for such a seizure. Doc. 38 at 7.

### A. Consensual Encounter.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . . So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (citation omitted). The government bears the burden of showing that "there was no duress or coercion, express or implied, and that the consent was unequivocal and specific and freely and intelligently given." *Id*.

Considering the totality of the circumstances, the Court concludes that Defendant's interview with the agents was consensual. The Ninth Circuit's decision in *Brown*, which also found an encounter with law enforcement officers to be consensual, is instructive.

While talking to Agent Cauble by phone, Defendant agreed to meet for a conversation. Defendant chose the place (a gas station near his work) and the time (his lunch hour – 11:00 a.m.), and travelled to the location on his own. His interview with the ATF agents "occurred in the middle of the day and in public view[.]" *Id.* (citations omitted). Sounds in the audio recording reflect that the gas station was near a busy street. The agents were dressed in plain clothes with no ATF markings, and their weapons were not visible. They never drew their weapons and "never suggested that [Defendant] was not

3

free to decline to answer or to ignore the officer." *Id.* Indeed, they told Defendant that he was not in trouble and they were "just talking" with him. Doc. 32-2 at 11-12.

"The officers' initial approach was casual and nonthreatening." *Brown*, 996 F.3d at 1005. Agent Cauble explained that he was accompanied by the two other agents because "I can't meet anybody by myself." Doc. 32-2 at 3. The audio recording shows the officers addressed Defendant in a nonthreatening, conversational tone. Doc. 32-3. Agent Cauble testified that he and the other agents stood on one side of a gas-pump island and Defendant stood on the other, in front of his van. Other than initial fist-bumps, the agents did not touch Defendant. Nor did they surround him, block his access to his van, or block the van's path out of the gas station.

The agents asked questions about Defendant's residence, work, and reasons for purchasing the Browning rifle. Doc. 32-2 at 4-10. They told him why they were looking into his purchase, explaining that Arizona is on the border of Mexico, certain guns are highly sought out by the drug cartels in Mexico, especially belt-fed guns like the rifle Defendant had purchased, and the agents do a background search and interview when they are alerted to such purchases. *Id*. at 12-14. The agents asked Defendant directly if he had purchased the gun for someone else. *Id.* at 15-16, 19. This question is not unlike the officers' question in *Brown*: "do we have a drug deal going on here?" 996 F.3d at 1002. Defendant said no, several times. Doc. 32-2 at 15-16, 19. After 22 minutes, the agents concluded the interview by giving Defendant a warning letter about the illegality of straw purchases and he departed the gas station. *Id.* at 33.

Defendant argues that the interview was nonconsensual because he learned during the initial phone call that the ATF had taken possession of his firearm. Doc. 32 at 5-6. But Defendant does not contend it was improper for ATF to seize the gun, that the agent promised to deliver the weapon if he came to the gas station, or that he expected the agents to do so. Although Defendant's desire to retrieve the gun likely motivated him to talk with the agents, the Court cannot conclude that this motivation restrained his liberty. Given all of the circumstances discussed above, the Court concludes that the ATF's possession of

the firearm would not have caused a reasonable innocent person in Defendant's position to believe he could not depart from the gas station interview. *Brown*, 996 F.3d at 1005 (the "reasonable person" test "presupposes an innocent person") (citation omitted).

Defendant also notes that the agents told him they did not believe his statements and warned him about the adverse consequences of lying to them, including that he could lose his position working for courts. Doc. 32 at 3-4. But these statements – which are captured in the audio recording – were not accompanied by any other actions of the agents designed to prevent Defendants from leaving the gas station, and the Court cannot conclude they converted the consensual interview to an investigative seizure. *See United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) ("We have identified several non-exhaustive situations where an officer's actions escalate a consensual encounter into a seizure: when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person, or if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

In summary, the Court finds that Defendant voluntarily appeared for his interview with the agents, at a public gas station of his choosing at mid-day, the officers were in plain clothes and never displayed their weapons, they did not surround, touch, or restrain Defendant, they told Defendant he was not in trouble and they were just talking with him, they explained why they were interviewing him, their tone was nonthreatening and conversational, and they gave him a warning letter and allowed him to depart. A reasonable person in Defendant's position would have felt free to terminate the conversation and depart. The fact that the presence of law enforcement officers might have a somewhat intimidating effect on some people does not convert an interview into a seizure. *United States v. Ayon-Meza*, 177 F.3d 1130, 1133 (9th Cir. 1999).

/ / /

/ / /

### B. Reasonable Suspicion.

Even if the Court were to find that the interview constituted a seizure, such a seizure did not violate Defendant's constitutional rights. An officer must have reasonable suspicion of criminal activity for a seizure. *Summers*, 268 F.3d 686. "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (quoting *United States v. Montero-Camargo,* 208 F.3d 1122, 1129 (9th Cir. 2000)).

To determine whether an officer had a particularized and objective basis for suspecting a person of criminal activity, courts look to the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417 (1981), considering "both the content of information possessed by police and its degree of reliability," *Navarette v. California*, 572 U.S. 393, 396 (2014). While a "mere 'hunch' does not constitute reasonable suspicion, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard[.]" *United States v. Lewis*, No. CR1800927001PHXDGC, 2018 WL 6599817, at *3 (D. Ariz. Dec. 17, 2018) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Courts permit officers to consider "the modes or patterns of operation of certain kinds of lawbreakers," *United States v. Cortez*, 449 U.S. 411, 418 (1981), and "make 'commonsense judgments and inferences about human behavior,'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

The Court finds the agents had reasonable suspicion that Defendant was engaged in criminal activity in light of the following facts:

- ATF was contacted by a licensed federal firearms dealer who had suspicions about Defendant's purchases. The manager of Tactical, who had called Agent Cauble in the past, told the agent that when Defendant acquired the Pioneer Arms rifle a few days earlier, he explained that he had saved a long time to accumulate the $800 paid for the weapon, suggesting he could hardly afford the price. But one day after picking up the

6

Pioneer Arms rifle, Defendant returned and paid $8,000 in cash for the Browning firearm, explaining that he had received an $8,000 refund of child support payments – a statement that seemed odd to the manager. This report to the ATF carried some "indicia of reliability," *United States v. Williams*, 837 F.3d 1016, 1021 (9th Cir. 2016), because it came from the manager of a federal firearms licensee who had made reports to ATF previously. *See United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006) (a tip from a "known informant" is considered more reliable than an anonymous tip, particularly if that informant has a "proven track record of reliability" and "reveals the basis of knowledge of the tip"); *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (tips that identify the tippee or the tippee's employer are "entitled to greater reliability" because they either identify or "narrow the likely class of informants").

- Agent Cauble conducted an investigation before calling Defendant and found that Defendant's last earnings reported to the Arizona Department of Economic Security were less than $10,000, reported more than two years before the purchase, suggesting that Defendant may not have had the financial resources to pay $8,000 in cash.

- The large, belt-fed, Browning firearm Defendant purchased is highly trafficked.

- The purchase was made in an area close to the border with Mexico where other gun trafficking crimes occur.

These facts provided an objective basis for reasonable suspicion that Defendant had engaged in criminal conduct. They "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418. And as noted above, the likelihood of criminal activity need not rise to the level required for probable cause and falls considerably short of satisfying a preponderance of the evidence standard. *Lewis*, 2018 WL 6599817, at *3.

Defendant argues that his purchases of the firearms were not illegal, but this fact does not defeat reasonable suspicion. The Supreme Court has "consistently recognized

that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, 572 U.S. at 403 (quoting *Arvizu*, 534 U.S. at 277).

Defendant argues that this case parallels *United States v. Hernandez-Alvarado*, 891 F.2d 1414 (9th Cir. 1989). The Ninth Circuit found in that case that the following facts did not give rise to reasonable suspicion: (1) the nervous demeanor of both the defendant and his passengers as they sat in their vehicle; (2) the reduction in speed from 65 to 55 m.p.h. when followed by law enforcement; (3) the presence of a two-way antenna on the trunk of the vehicle; (4) the defendant's residence in a neighborhood on the U.S.-Mexican border, which was under investigation for narcotics activity; (5) the license plate bracket indicating that the car had been purchased from a dealership associated with drug trafficking; and (6) the size of defendant's trunk. *Id.* at 1418. The Ninth Circuit found that these facts presented a "close question," *id.* at 1416, but ultimately concluded they were insufficient to support an investigative stop because "they describe too many individuals to create a reasonable suspicion that this particular defendant is engaged in criminal activity," *id*. at 1418-19. The same is not true here. Defendant's purchase of a large, highly-trafficked weapon, in a border State, with no apparent financial means for making the purchase, and under circumstances suspicious enough for a licensed federal firearms dealer to contact ATF and report the purchase, simply cannot be said to describe a large class of individuals, as did the facts known to the officers in *Hernandez-Alvarado*. The facts in this case were particularized enough to create reasonable suspicion regarding Defendant.

**III.    Alleged Miranda Violation.**

Because Defendant was not subjected to a custodial interrogation, the law did not require a *Miranda* warning. A suspect is in custody and must be given such a warning if he "has been 'deprived of his freedom of action in any significant way.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir.2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The Ninth Circuit identifies five factors to consider in assessing whether a suspect is in custody: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of

the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002). These factors are not exhaustive. *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009). After considering the totality of the circumstances, the court must decide whether a reasonable person would feel at liberty to leave or terminate the interview. *Craighead*, 539 F.3d at 1082.

Defendant's argument that his interview at the gas station was a custodial interrogation is not supported by the *Kim* factors. (1) Agent Cauble testified that he called Defendant, told him ATF had taken possession of his firearm, and asked if he would be willing to talk. Defendant said yes and chose the time and location. For reasons explained above, the Court concludes that Defendant met the agents at the gas station voluntarily. (2) The agents told Defendant they had looked into his finances and did not think he had the means to purchase the firearm. They also told him that they doubted his story and were suspicious of his activity, and they warned him about the repercussions of committing a felony. Doc. 32-2 at 20-21, 25-31. This factor weighs in favor of finding the interview custodial. (3) The interview occurred in a public place, outside, in full daylight. The agents did not restrain Defendant, surround him, show their weapons, or block his departure. (4) Defendant acknowledges that the encounter was not "excessively long[.]" Doc. 32 at 13. It lasted 22 minutes. Doc. 38 at 4. The Court has listened to the recording of the interview and cannot conclude that the agents prolonged it unnecessarily. (5) The agents did not apply pressure to detain Defendant. The discussion was calm and nonthreatening, Defendant never attempted to end it, and as noted, the agents did not physically restrain Defendant, surround him, or block his departure. Defendant argues that they exerted pressure by asking him questions aimed at getting him to make incriminating statements and telling him that he had committed federal crimes that would result in a lengthy prison sentence. Doc. 32 at 10, 13-14. The agents did not say that he had committed a federal crime; they told him they were suspicious, explained why, and described possible

repercussions if they were correct. Doc. 32-2 at 25-31. The Court does not view these statements as pressure to detain Defendant.

Four of the five *Kim* factors suggest the gas station interview was not a custodial interrogation, and the second leans somewhat in the other direction. Considering the circumstances as a whole, as discussed above, the Court concludes that a reasonable person would have felt at liberty to end the interview and leave. Defendant was not in custody and entitled to a *Miranda* warning.

**IV.   Voluntariness of Defendant's Statements.**

Defendant argues that statements he made during the interview must be suppressed because they were not voluntary. Doc. 32 at 14. It is not clear what statements Defendant wants to suppress. He did not confess to any crime; he maintained throughout the interview that his purchase of the weapon was lawful. It may be that Defendant wishes to suppress his explanation for how he acquired the $8,000 in cash (that he won it at a casino), but he never explains how this statement resulted from undue pressure by the agents.

Beyond his *Miranda* arguments, which the Court does not find persuasive, Defendant cites 18 U.S.C. § 3501(b), which sets out factors to consider when assessing the voluntariness of a confession. Section 3501(b) is not helpful. The statute clearly addresses confessions made in a custodial setting, identifying factors such as the time elapsed between arrest and arraignment, whether the defendant knew of the charges pending against him, whether the defendant had received a *Miranda* warning, whether the defendant had been advised of his right to counsel, and whether the defendant had counsel at the time of his confession. 18 U.S.C. § 3501(b). Because Defendant was not in custody at the gas station, these factors are not relevant.

Generally, a confession is involuntary if it is not "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (citation omitted). A necessary predicate to finding a confession involuntary is that it was produced through "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Whether a confession is involuntary must be analyzed in the "totality of [the] circumstances."

*Withrow v. Williams*, 507 U.S. 680, 693 (1993). "The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citations omitted).

For reasons explained above, the Court does not find there was any significant degree of police coercion in this case. Defendant's interview was outside, at a place of his choosing, and not in a setting calculated to produce coercive pressure. Defendant clearly understood the discussion and was capable of resisting any pressure that was applied, as shown by the fact that he never confessed to any offense. *See* Doc. 32-2. The Court cannot conclude that Defendant's will was overborne, as he contends.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 32) is **denied.**

Dated this 29th day of April, 2025.

David G. Campbell
Senior United States District Judge